# Exhibit 2

SC 1965 SERVICE & 1970 EVIDENCE & 1980
ACCESS TO JUSTICE

JULY 2024



# Conclusions & Recommendations (C&R)

The Special Commission (SC) on the practical operation of the *Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* (Service Convention), the *Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters* (Evidence Convention), and the *Convention of 25 October 1980 on International Access to Justice* (Access to Justice Convention) met from 2 to 5 July 2024. The meeting was attended by 260 delegates and other experts, in person and online, representing 55 HCCH Members, two non-Member Contracting Parties, one Observer State, seven Observer intergovernmental organisations and 13 Observer international non-governmental organisations, as well as by members of the Permanent Bureau (PB).[1]

The SC celebrated its meeting as the first official meeting of the HCCH with Spanish as an additional official language.

The SC adopted the following C&R:

## I. Service, Evidence, and Access to Justice Conventions

### 1. Implementation, operation and general information

1  The SC reaffirmed the importance of effective cross-border judicial and administrative cooperation. In this regard, the SC emphasised the continued importance of the Service, Evidence, and Access to Justice Conventions (Conventions).

2  The SC noted with great satisfaction that since its last meeting in 2014, a number of States have become Party to the Conventions. The SC welcomed the accession of Andorra, Azerbaijan, Brazil, Costa Rica, Dominican Republic, El Salvador, Georgia, Kazakhstan, Marshall Islands, Nicaragua, Paraguay, Philippines, Singapore, Tunisia, and Viet Nam to one or more of these Conventions.

3  Noting the need to promote the benefits of the Conventions to non-Contracting Parties, the SC encouraged States that are currently not Party to the Conventions to join them. States interested in joining the Conventions are encouraged to contact the PB in advance with a view to facilitating effective preparation, including in relation to possible declarations and reservations.

4  The SC noted the value of monitoring the Conventions' practical operation through its meetings. The SC acknowledged the benefits in enabling Contracting Parties to exchange their respective experiences in operating the Conventions to promote uniform interpretation and to foster mutual confidence in the application of these Conventions.

---

[1] The following Members of the HCCH were represented: Albania, Argentina, Australia, Austria, Belgium, Brazil, Bulgaria, Canada, China (People's Republic of), Costa Rica, Croatia, Czech Republic, Dominican Republic, El Salvador, Estonia, European Union, Finland, France, Georgia, Germany, Hungary, India, Ireland, Israel, Italy, Japan, Kazakhstan, Latvia, Lithuania, Malta, Mexico, Morocco, Netherlands, Nicaragua, Norway, Paraguay, Philippines, Poland, Portugal, Republic of Korea, Romania, Russian Federation, Serbia, Singapore, Slovakia, Slovenia, Spain, Sweden, Switzerland, Türkiye, Ukraine, United Kingdom, United States of America, Venezuela and Viet Nam; in addition to the following non-Member Contracting Parties: Colombia and Seychelles, the following non-Member State: Indonesia; the following intergovernmental organisations: CIEC (*Commission internationale de l'état civil*), Council of Europe, OECS (Organisation of Eastern Caribbean States), OIC (Organisation of Islamic Co-operation), The World Bank, UNCITRAL (United Nations Commission on International Trade Law) and WIPO (World Intellectual Property Organization); and the following international non-governmental organisations: ABLI (Asian Business Law Institute), AIPPI (*Association Internationale pour la Protection de la Propriété Industrielle*), ASADIP (American Association of Private International Law), CCBE (Council of Bars and Law Societies of Europe), EAPIL (European Association of Private International Law), EGPIL (European Group for Private International Law), ELI (European Law Institute), EUBF (European Bailiffs' Foundation), IAFL (International Academy of Family Lawyers), IBA (International Bar Association), IIL (Institute of International Law), ITechLaw (International Technology Law Association) and UIHJ (*Union internationale des huissiers de justice*).

5   The SC recommended having more frequent meetings to review the practical operation of the Conventions, including holding its next meeting in five to six years, subject to available resources. When deciding on the date of the meeting, the Council on General Affairs and Policy (CGAP) may wish to take into account any substantive revisions to the Service and Evidence Handbooks, new or ongoing issues in the practical operation of the Conventions, the work of any potential Experts' Group, and other developments in the use of information technology (IT) in the context of cross-border civil procedure.

6   The SC recalled the requirement for Contracting Parties to designate Central Authorities for these Conventions, and to inform the depositary (the Ministry of Foreign Affairs of the Kingdom of the Netherlands) of these designations. The SC called on Contracting Parties that have not done so to fulfil this requirement as quickly as possible. [See *C&R No 3 of the 2014 SC*]

7   The SC encouraged Contracting Parties to publicise these C&R among users of the Conventions, including judicial authorities, judicial officers, practitioners, and Central Authorities. [See *C&R No 2 of the 2014 SC*]

8   The SC noted that the Sections on the Service, Evidence, and Access to Justice Conventions on the HCCH website were helpful sources of information relating to the practical operation of the respective Conventions, and encouraged Contracting Parties to publicise them.

9   The SC encouraged Contracting Parties to the Service and Evidence Conventions to complete the Country Profiles,[2] in particular the contact details for Central Authorities and other authorities designated under the Conventions, and to continue to update information in a timely manner.

## 2. Communication and use of IT

10   The SC reiterated the importance of effective communication among Contracting Parties. To that end, the SC encouraged relevant authorities to communicate with each other using IT methods, taking into account data security and privacy considerations. The SC agreed that Contracting Parties should include specific transmission and communication requirements in their respective Country Profiles to ensure that these issues are taken into account by other Contracting Parties.

11   With regard to facilitating communication and cooperation among Central Authorities, the SC recommended that the PB prepare for each Convention an internal list of e-mail addresses of and for Central Authorities. The SC noted the importance of keeping these lists up to date.

12   The SC urged the relevant authorities forwarding a request under the Conventions to provide sufficient contact information including e-mail addresses in their requests to facilitate communication between authorities, given the importance of expeditious execution of the requests.

13   The SC emphasised that the Conventions operate in an environment which is subject to important technological developments, which have been further stimulated by the COVID-19 pandemic. Although the evolutionary use of IT could not be foreseen at the time of the adoption of the Conventions, the SC reiterated that IT is an integral part of today's society and its usage is a matter of fact. In this respect, the SC recalled that the spirit and letter of the Conventions do not constitute an obstacle to the usage of IT, and that the application and operation of the Conventions can be further improved by relying on such technology. [See *C&R No 4 of the 2003 SC*, *C&R No 3 of the 2009 SC*]

14   The SC encouraged Contracting Parties, where possible, to implement electronic case registers or management systems to track or record requests.

---

[2]   Once finalised and approved by CGAP, these Country Profiles will be made available on the relevant Sections of the HCCH website.

## II. Evidence Convention

### 1. Implementation and general information

15  The SC recalled the importance of the Evidence Convention as a bridge between common law and civil law procedures relating to the taking of evidence in civil and commercial litigation. [*See C&R No 34(a) of the 1989 SC, C&R No 27 of the 2003 SC*]

16  The SC recalled that, pursuant to Article 39(4), the Evidence Convention only applies between an acceding State and an existing Contracting Party if the accession is accepted by that existing Contracting Party. The SC urged all Contracting Parties to consider each accession with a view to its acceptance. [*See C&R No 8 of the 2014 SC*]

17  With a view to enhancing the operation of the Convention, the SC encouraged Contracting Parties that have made a Chapter II reservation to review and revisit their reservation.

18  The SC noted the benefits of the taking of evidence by Commissioners under Article 17, especially in terms of the speedy execution of requests.

### 2. Nature of the Convention

19  The SC noted that there are still differing views among Contracting Parties as to the mandatory or non-mandatory character of the Evidence Convention. The SC also noted that these differences, however, have not been an obstacle to the effective operation of the Convention. Having regard to the objectives of the Evidence Convention, the SC encouraged that in all Contracting Parties, whatever their views as to its mandatory application, priority should be given to the procedures offered by the Convention when evidence located abroad is being sought. [*See C&R No 34(b) and (c) of the 1989 SC, C&R No 37 of the 2003 SC, C&R No 53 of the 2009 SC*]

### 3. Article 1(2)

20  The SC noted the practice of Contracting Parties that the expression "contemplated" in Article 1(2) includes proceedings for the taking of evidence before the main proceedings have been instituted, and where there is a danger that evidence may be lost. [*See C&R No 47 of the 2009 SC*]

21  The SC recommended that the word "commenced" should be given a uniform interpretation across Articles 1(2), 15(1) and 16(1). [*See C&R No 48 of the 2009 SC*]

### 4. Central Authorities and their functions

22  The SC reiterated that the practical operation of the Evidence Convention would be further improved by more timely execution of Letters of Request. The SC also encouraged better communication between Central Authorities and between requesting authorities and the relevant Central Authority at all stages of the execution of a Letter of Request. Any informal communication may be carried out by any appropriate means, including e-mail, while taking into account data security and privacy considerations. [*See C&R No 44 of the 2009 SC, C&R No 9 of the 2014 SC*]

23  The SC noted that many Central Authorities provide informal assistance to requesting authorities to ensure that a Letter of Request conforms to the requirements of the requested State. The SC encouraged this practice. [*See C&R No 45 of the 2009 SC*]

24  The SC encouraged Contracting Parties to:

   a. promptly acknowledge the receipt of Letters of Request;
   b. promptly respond to enquiries about the status of execution; and
   c. communicate an indication of steps to be taken for execution. [*See C&R No 10 of the 2014 SC*]

25  The SC welcomed the use of electronic tools that allow the status of requests to be checked online, noting the importance of taking into account data security and privacy considerations. [*See C&R No 11 of the 2014 SC*]

### 5. Transmission of and responses to Letters of Request

26  The SC noted that many Contracting Parties are able to transmit and receive Letters of Request electronically. The SC encouraged Contracting Parties to transmit and receive Letters of Request in electronic form where it is possible to do so. [*See* C&R No 49 of the 2009 SC, C&R No 39 of the 2014 SC]

27  The SC noted and encouraged the practice of many Contracting Parties accepting Letters of Request that have been sent by private courier. [*See* C&R No 49 of the 2009 SC]

28  The SC welcomed the practice whereby, in response to a Letter of Request, evidence is, where appropriate, returned by electronic means, taking into account data security and privacy considerations.

29  The SC recommended that Letters of Request be sent to the competent Central Authorities and in this regard, the requesting authority check this information in the Country Profile of Contracting Parties.

### 6. Use of the recommended Model Form

30  The SC strongly recommended that the Model Form developed by the SC in 1978 and revised in 1985 be used. Recognising that this Form is not mandatory, the SC nonetheless considered that regular use of the Model Form would further enhance the practical operation of the Convention. [*See* C&R No 54 of the 2009 SC]

31  The SC noted that many Central Authorities prefer Letters of Request to be issued using the Model Form filled in electronically, and that the *Guidelines for Completing the Model Form*, developed by the PB, is a useful reference tool for completing the Model Form. [*See* C&R No 12 of the 2014 SC]

32  The SC encouraged Contracting Parties to use electronic versions of the Model Form and noted that digital or electronic signatures on requests can generally be accepted, especially if they are transmitted from a competent forwarding Authority and, where applicable, can be easily verified.

33  The SC also encouraged Contracting Parties to share in their Country Profiles whether they have adopted measures (or will adopt measures) to support the acceptance of digital or electronic signatures on requests.

34  The SC noted that some trilingual Model Forms have been prepared by the PB and invited Contracting Parties which have not yet submitted copies of the Model Form in their languages to the PB to do so soon so that the PB can prepare the respective trilingual Model Forms and make them available on the website of the HCCH.

### 7. Expeditious execution of the requests

35  The SC recalled that Article 9(3) requires that "[a] Letter of Request shall be executed expeditiously" and encouraged Contracting Parties to take measures to improve the effective operation of the Convention. [*See* C&R No 43 of the 2009 SC]

36  The SC recommended that requests for evidence be presented as soon as practically possible so as to provide sufficient time for their execution in the requested State. [*See* C&R No 39 of the 2003 SC]

37  With a view to avoiding unnecessary delays where a Letter of Request is deficient, the SC recommended that Central Authorities or executing authorities encourage the requesting authority to reformulate and resubmit its Letter of Request. In cases where the request appears to be partially deficient, the executing authorities should, wherever appropriate, execute the portion of a letter that is not deficient rather than to reject the entire request. [*See* C&R No 41 of the 2003 SC]

### 8. Translations

38  The SC noted the importance of providing an accurate and complete set of translations for the expeditious execution of Letters of Request and encouraged Contracting Parties to comply with the translation requirements as set out in Article 4 of the Convention, in order to avoid delays in the

execution of Letters of Request. The SC encouraged Contracting Parties to provide this information (including any declaration) and any specific requirements in their Country Profiles.

### 9. Costs for execution and reimbursement

39  The SC noted that Article 14(2) of the Evidence Convention confers a right to require the reimbursement of "fees paid to experts and interpreters" and the "costs occasioned by the use of a special procedure" requested under Article 9(2). The SC concluded that Article 14(2) does not provide for the requested State to require advance payment of costs. [See C&R No 13 of the 2014 SC]

40  The SC concluded that a requested State may require reimbursement of fees paid and / or costs occasioned pursuant to Articles 9(2) and 14(2) even if the evidence is no longer sought (*e.g.,* where the requesting Authority withdraws the Letter of Request). [See C&R No 14 of the 2014 SC]

41  The SC acknowledged that electronic payment facilitates reimbursement and encouraged Central Authorities to include this information in their Country Profiles and to keep this information up to date. [See C&R No 15 of the 2014 SC]

### 10. Judicial authorities and other authorities under Article 1

42  The SC noted that for the taking of evidence, requesting authorities not only include courts and judges but also other persons (such as notaries) insofar as these persons may perform, in certain Contracting Parties, functions of judicial authorities. Information on those other persons and the extent of their competence should be made available in the Country Profiles.

43  The SC noted that in some instances, and in accordance with the internal law of relevant Contracting Parties, the Convention has been made available for use in arbitration proceedings. The SC stressed that a request for the taking of evidence under the Convention would have to be presented by the relevant judicial authority of the Contracting Party where the arbitration proceedings take place. [See C&R No 38 of the 2003 SC]

### 11. Types of evidence and its use

44  The term "evidence" covers information stored in digital form (electronic evidence), which may include e-mail messages, digital images, and entries in electronic registers. The SC recommended that requests for electronically stored information should be treated in the same manner as requests for hard copy documents. [See C&R 50 of the 2009 SC]

45  The SC noted that the term "evidence" should be given a uniform meaning in each Chapter of the Convention and interpreted in an autonomous manner. The SC further recommended that the term "evidence" should be interpreted liberally. [See 1978 SC, Part 1, para 2(A)]

### 12. Use of IT (taking evidence by video-link)

46  The SC recalled that there is no legal obstacle to the usage of IT under the Convention. However, the use of some techniques may be subject to different legal requirements in different Contracting Parties (*e.g.,* obtaining the consent of all parties involved in the execution). [See C&R No 42 of the 2003 SC]

47  The SC reaffirmed that where a special method or procedure is requested for the taking of evidence (Art. 9(2)), the exception for methods that are "incompatible with the internal law of the State of execution or [...] impossible of performance by reason of its internal practice and procedure or by reason of practical difficulties" should be interpreted narrowly to permit, to the greatest possible extent, the use of IT. [See C&R No 43 of the 2003 SC]

48  The SC noted that the use of video-link and similar technologies to assist the taking of evidence abroad is consistent with the current framework of the Convention. In particular, the SC noted that:

   a. The Convention permits parties and their representatives to be present (Art. 7), and does not preclude judicial personnel of the requesting authority from being present (Art. 8), by video-link at the execution of the Letter of Request by the requested State, to the same extent as these persons could be physically present.

- b. The Convention permits a video-link to be used to assist in the execution of a Letter of Request where the law of the requested State permits such use (Art. 9(1)).
- c. A video-link may be used to assist in the execution of a Letter of Request in accordance with Article 9(2).
- d. The Convention permits a video-link to be used to assist in the taking of evidence by a diplomatic official, consular agent or Commissioner, provided that the practice is not forbidden by the Contracting Party in which the evidence is to be taken, and provided that the relevant permission has been granted (Arts 15-17 and 21).
- e. The SC encouraged Contracting Parties to exchange information about their experience with the use of video-link and other IT to assist with the taking of evidence abroad. [See *C&R Nos 55 and 57 of the 2009 SC*]

49  The SC noted that the Country Profiles will provide a useful source of information for any parties or officials seeking to use video-link in connection with the taking of evidence in another Contracting Party, and that Contracting Parties should provide information about video-link in their Country Profiles and keep this information up to date. The SC also encouraged Contracting Parties to promote the existence of these Country Profiles nationally and recommended that they be consulted prior to the making of a request involving video-link.

50  The SC recalled that Article 17 allows a member of the judicial personnel of the court of origin (or other duly appointed person) who is located in one Contracting Party, to examine a person located in another Contracting Party by video-link. [See *C&R No 20 of the 2014 SC*]

51  The SC acknowledged the different views regarding the use of video-link to take evidence directly under Chapter I, despite the benefits that it can bring. The SC encouraged Contracting Parties which permit the direct taking of evidence by video-link under Chapter I to provide more information to the PB about how this occurs in practice so that examples can be summarised and included in the Evidence Handbook and, if required, further information can be developed to inform Contracting Parties on this issue.

### 13. Grounds for refusal

#### Article 12

52  The SC recalled the exhaustive nature of the grounds for refusal set out in Article 12(1). [See *C&R No 16 of the 2014 SC*]

#### Article 23

53  The SC noted that the terms of Article 23 continue to be a source of misunderstanding. The SC recalled that Article 23 is intended to ensure that a request for the production of documents must be sufficiently substantiated, so as to avoid requests whereby one party merely seeks to find out what documents may generally be in the possession of the other party to the proceeding. [See *C&R No 29 of the 2003 SC*]

54  The SC recalled that the wording of the declaration submitted by the United Kingdom reflects the purpose of Article 23 more adequately than the wording of the provision itself. Against this background, the SC recommended that Contracting Parties which have made a general, non-qualified declaration under Article 23 revisit their declaration, taking into account terms such as those contained in the United Kingdom declaration or in Article 16 of the *Additional Protocol of 1984 to the Inter-American Convention on the Taking of Evidence Abroad*. The SC recommended that Contracting Parties refrain from applying Article 23 to refuse the execution of Letters of Request for the production of documents that are specified in the request, or otherwise reasonably identified.

55  The SC noted that Article 23 expressly refers to "documents" and that the scope of the provision should not be extended to oral testimony. [See *C&R No 35 of the 2003 SC*]

56  The SC noted that Article 23 only applies to Chapter I. However, when considering a request for prior permission under Chapter II, the Convention does not preclude a requested authority from making its permission conditional on requiring an appropriate level of specificity.

57 The SC further recalled the following C&R of previous meetings: C&R Nos 29-34 of the 2003 SC; C&R Nos 51 and 52 of the 2009 SC; and C&R Nos 18 and 19 of the 2014 SC.

### 14. Relationship of the Convention with other instruments (including bilateral, multilateral)

58 Recalling the relationship of the Convention with other instruments, the SC recommended greater elaboration in the Evidence Handbook on such relationship, including with regional and bilateral instruments, and the situation where the States involved are not Party to the Convention. The SC encouraged Contracting Parties to provide information about all other instruments that would apply in parallel with the Evidence Convention in their Country Profiles.

## III. Access to Justice Convention

### 1. Operation and application

59 The SC noted that the existence and implementation of similar instruments related to access to justice at regional or bilateral level should not deter States in their consideration of ratifying or acceding to the Convention which is an important component of an efficient system of international legal cooperation. [See C&R No 60 of the 2009 SC]

60 Notwithstanding other approaches in bilateral or regional instruments, the SC considered, in light of the Explanatory Report and the prevailing view in comparative law, that the wording of Article 1 does not accommodate the inclusion of legal persons within its scope of application. [See C&R No 61 of the 2009 SC]

61 The SC was of the view that the word "presence" in Article 2 is to be interpreted in a literal way. [See C&R No 62 of the 2009 SC]

62 The formulation of Article 14 leaves some uncertainty with regard to who is exempt from giving security for costs. Nevertheless, the SC was of the view that nationals of a Contracting Party who are habitually resident in the State where the proceedings are brought fall within the scope of application of this provision. [See C&R No 63 of the 2009 SC]

63 When examining an application for legal aid, the competent authorities of the requested State are invited to take into account the economic situation of the applicant in their State of residence. In this context, the competent authorities of the requesting State may for example transmit any document useful for assessing the economic situation in the State of residence or confirm if the applicant meets the criteria for legal aid in their State of residence.

### 2. Implementation tools

64 Recognising the continuing importance and increasing use of the Access to Justice Convention, the SC recalled the usefulness of multilingual forms and further translations of the Convention, with a view to encouraging further accessions. [See C&R No 64 of the 2009 SC, C&R No 22 of the 2014 SC]

## IV. Service Convention

### 1. Implementation and general information

65 The SC recalled that one of the fundamental purposes of the Service Convention is to ensure that judicial and extrajudicial documents are brought to the notice of the addressee in sufficient time. [See C&R No 6 of the 2009 SC]

### 2. Nature of the Convention (non-mandatory but exclusive character of the Convention)

66 The SC confirmed the view that the Service Convention is of a non-mandatory but exclusive character, without prejudice to international law on the interpretation of treaties. The SC further noted with great satisfaction that the non-mandatory but exclusive character of the Service Convention has not caused any difficulties in the past 10 years. [See C&R No 73 of the 2003 SC, C&R No 12 of the 2009 SC]

### 3. Application of the Convention

67 The SC noted that the absence of a specific rule on the date of service has not caused any major problems in practice. [S*ee C&R No 36 of the 2009 SC*]

68 The SC noted that various States recognise many kinds of extrajudicial documents. The SC invited Contracting Parties to encourage Central Authorities and, where applicable, forwarding authorities to communicate when problems of interpretation arise. [S*ee C&R No 15 of the 2009 SC*]

69 The SC noted that no particular challenges arise in respect of the use of the Convention for the service of documents relating to class actions. The SC noted that the Convention is applicable to a request for service upon a defendant in a class action. The SC noted that, in the general case, the Convention does not apply to the sending of information regarding the constitution of a possible class (including notices sent abroad encouraging possible claimants to opt in or opt out of a particular class). [S*ee C&R No 17 of the 2009 SC*]

### 4. Central Authorities (designation and organisation)

70 The SC reaffirmed that it is for a Contracting Party to determine its own model for the organisation of the Central Authority functions. In particular, the SC noted that the terms of the Convention do not preclude a Central Authority from contracting activities under the Convention to a private entity, while retaining its status as Central Authority and ultimate responsibility for its obligations under the Convention. [S*ee C&R No 52 of the 2003 SC*]

### 5. Use of IT (service by digital means – the Service Convention)

71 Recalling the importance of taking into account data security and privacy considerations, the SC reiterated that the operation of the Convention is to be considered in light of a business environment which relies on IT, and that the electronic transmission of judicial communications is a growing part of that environment and its use should be encouraged. [S*ee C&R No 59 of the 2003 SC*]

72 The SC recognised that the Convention does not on its terms deal with internal procedures but there is a link between domestic legal systems and the functioning of the Convention. [S*ee C&R No 61 of the 2003 SC*]

73 The SC also recognised that in some domestic legal systems the relevant legal procedures and technological conditions do not allow for service by electronic means, although in certain systems the use of e-mail and online platforms is permitted in certain circumstances, particularly where approved by the judicial authority in advance or there is prior consent by the addressee. [S*ee C&R No 64 of the 2003 SC*]

74 The SC noted that, subject to the domestic law of the requested State, requests for service transmitted under the main channel of transmission (the Central Authority) may be executed by electronic means under Article 5. The SC also noted developments in the use of IT under the alternative channels of Article 10. [S*ee C&R No 37 of the 2014 SC*]

75 The SC invited the PB to continue to monitor developments in this area and encouraged Contracting Parties to reflect such developments in their Country Profiles. [S*ee C&R No 38 of the 2014 SC*]

### 6. Assistance in locating the addressee

76 Recognising that there is no obligation to provide assistance in locating an addressee to be served under the Service Convention, the SC acknowledged that some Contracting Parties have employed a variety of practices to assist, as a requested State, in circumstances when the address is incomplete or incorrect. Some have even reported assistance when the address is unknown. The SC encouraged Contracting Parties to provide such assistance consistent with their legal and structural capabilities, when able to do so. The SC also encouraged Contracting Parties to indicate in their Country Profiles whether they would provide such assistance and information about different possibilities to locate the addressee. [See *C&R No 23 of the 2014 SC*]

| | |
|---|---|
| 77 | When providing assistance in locating an addressee, an authority may become aware of potential risks to the health, safety or liberty of that addressee. In such cases, the SC suggested that the authority should take necessary precautions. |

### 7. Use of the Model Form

| | |
|---|---|
| 78 | The SC strongly reaffirmed that the use of the Model Form is mandatory (Art. 3(1)), and encouraged relevant authorities in Contracting Parties to use it with the "Summary" and "Warning". The SC also encouraged the use of the "Summary" and "Warning" of the Model Form where one of the alternative channels of transmission is used. The SC noted that many trilingual Model Forms have been prepared by the PB and invited Contracting Parties which have not yet submitted copies of the Model Form in their languages to the PB to do so soon so that the PB can prepare the respective trilingual Model Forms and make them available on the website of the HCCH. [*See C&R Nos 29 and 31 of the 2009 SC, C&R No 27 of the 2014 SC*] |
| 79 | The SC noted the usefulness of the *Guidelines for Completing the Model Form* (Guidelines) developed by the PB and welcomed the minor updates to the Guidelines. The SC invited the Working Group on the Service Handbook to continue refining the Guidelines, with a view to having them approved by CGAP. Once approved, the Guidelines would be inserted at Annex 6 of the Service Handbook and be made available on the website of the HCCH. The SC encouraged Contracting Parties to circulate and publish the updated Guidelines. |
| 80 | The SC recalled that under Article 7(2) of the Convention, the fields of the Model Form are to be completed in English, French, or in (one of) the official language(s) of the requested State. As long as the Model Form is completed in English or French, the request may not be rejected solely on the basis of the Model Form not being in the official language of the requested State. [*See C&R No 32 of the 2009 SC*] |
| 81 | The SC strongly recalled Article 3(1), according to which there is no requirement for a completed Model Form to be legalised, or be made subject to any equivalent formality such as an Apostille. [*See C&R No 34 of the 2009 SC*] |
| 82 | The SC noted that the effect of a Certificate certifying the execution of a request constitutes authoritative confirmation that service has been effected in conformity with the law of the requested State, and creates at least a rebuttable presumption that service was properly performed. The probative value of the Certificate in the requesting State remains subject to that State's law. Notice of a rejection is also authoritative confirmation that service was not effected. [*See C&R No 33 of the 2009 SC*] |
| 83 | The SC stressed that a properly completed Certificate should be returned to the applicant (*i.e.,* the forwarding authority). [*See C&R No 26 of the 2014 SC*] |
| 84 | The SC encouraged Contracting Parties to use electronic versions of the Model Form and noted that digital or electronic signatures on requests can generally be accepted, especially if they are transmitted from a competent forwarding Authority and where applicable can be easily verified. |
| 85 | The SC also encouraged Contracting Parties to share in their Country Profiles whether they have adopted measures (or will adopt measures) to support the acceptance of digital or electronic signatures on requests. |

### 8. Forwarding authorities

| | |
|---|---|
| 86 | The SC recalled that it is for the law of the requesting State to determine the competence of the forwarding authorities (Art. 3). [*See C&R No 47 of the 2003 SC*] |
| 87 | The SC also accepted the suggestion that such information be included on the Model Form. [*See C&R No 48 of the 2003 SC*] |
| 88 | The SC recommended that in any question of doubt as to the competence of the forwarding authority, rather than rejecting the request, the authorities in the State requested should seek to confirm that competence by either consulting the HCCH website or by making expeditious informal enquiries of the forwarding authorities, including by way of e-mail. [*See C&R No 49 of the 2003 SC*] |

### 9. Language and translation requirements

89  Regarding the translation requirement for service under Article 5(1), the SC noted the importance of respecting the various requirements provided in the domestic laws of Contracting Parties. [*See C&R No 67 of the 2003 SC*]

90  The SC noted the practice of some Contracting Parties which do not require translations in certain cases, for example where the addressee is shown to understand the language in which the documents to be served are written. The importance of a properly completed Form, in particular the Summary, is stressed in this regard. [*See C&R No 26 of the 2009 SC*]

91  The SC recalled that no translation of the documents to be served is required for informal delivery. [*See C&R No 66 of the 2003 SC, C&R No 28 of the 2014 SC*]

92  The SC recognised that no translation is required, under the Convention, for transmission under alternative channels provided by the Convention; the SC noted, however, that in isolated cases such translation requirements are imposed by a State's domestic law. [*See C&R No 65 of the 2003 SC*]

93  The SC noted the importance of providing an accurate and complete set of translations for the expeditious execution of requests for service and encouraged Contracting Parties to comply with translation requirements as set out in Article 5 of the Convention, in order to avoid delays in the execution of requests for service. The SC encouraged Contracting Parties to provide this information and any specific requirements in their Country Profiles.

### 10. Prompt execution of requests

94  The SC welcomed the practice reported by some Contracting Parties whereby requests for service are executed in less than three months.

95  Aiming at further enhancing cross-border judicial cooperation among Contracting Parties, the SC recommended:

   a. A request for execution of service should be executed without undue delay, and Contracting Parties are encouraged to take measures to further improve the effective operation of the Convention.
   b. If a forwarding authority has not received any acknowledgement of receipt of the request for service from the requested State within 30 calendar days following the sending of the request, it is encouraged to contact the Central Authority in the requested State to enquire about the status of the request. Such enquiry should be answered within a reasonable time.
   c. Where the request for service cannot be executed as a result of inadequate information or document(s) forwarded, the Central Authority of the requested State is encouraged to contact, as promptly as possible, the forwarding authority in order to secure the missing information or document(s).
   d. Whenever the Central Authority of the requested State is considering, under Article 4, whether the request complies with the provisions of the Convention, it is encouraged to take that decision within 30 calendar days of receipt of the request.
   e. If at any time during the execution of the request for service, an obstacle arises which may significantly delay or even prevent execution of the request, the Central Authority of the requested State is encouraged to communicate with the forwarding authority as promptly as possible.
   f. If the forwarding authority has not received a Certificate confirming service or non-service from the relevant authority of the requested State within a reasonable time after sending the request, it is encouraged to contact the Central Authority of the requested State to enquire about the status of the execution of the request and the enquiry should be answered within a reasonable time.
   g. The Central Authority of the requested State is encouraged to take all reasonable and appropriate steps to execute the request until such time as the forwarding authority advises that service is no longer required.

| | | |
|---|---|---|
| | h. | The forwarding authority is also encouraged to specify in the request a time after which service is no longer required or inform the relevant authority of the requested State at any time that service is no longer required. [*See C&R No 23 of the 2009 SC*] |
| 96 | | The SC welcomed the practice reported by certain Contracting Parties whereby Central Authorities promptly respond to enquiries about the status of execution and encouraged all Contracting Parties to embrace this practice where possible. [*See C&R No 30 of the 2014 SC*] |
| 97 | | The SC encouraged Contracting Parties to provide an average time of execution in their Country Profiles, where possible. |

### 11. Costs for service and reimbursement

| | |
|---|---|
| 98 | The SC reaffirmed that according to Article 12(1), a Contracting Party shall not charge for its services rendered under the Convention. Nevertheless, under Article 12(2), an applicant shall pay or reimburse the costs occasioned by the employment of a judicial officer or other competent person. The SC urged Contracting Parties to ensure that any such costs reflect actual expenses and be kept at a reasonable level. [*See C&R No 53 of the 2003 SC*] |
| 99 | The SC recalled that Article 5(1)(b) allows for the applicant to request a particular method of service that is not incompatible with the law of the requested State. Where the requested method is prescribed by the domestic law of the requested State and ordinarily used in that State for the execution of requests, the requested State is encouraged not to charge for the execution of the request, without prejudice to Article 12(2)(a). [*See C&R No 20 of the 2009 SC*] |
| 100 | In response to concerns voiced by some Contracting Parties about difficulties with payments for costs incurred for service, the SC noted that payment methods regarding the Evidence Convention are equally applicable to payments under the Service Convention. [*See C&R No 32 of the 2014 SC*] |

### 12. Grounds for refusal

| | |
|---|---|
| 101 | The SC recalled the exhaustive nature of the grounds for refusal set out in Article 13(1) of the Service Convention and stressed the importance of providing notice of the refusal when the execution of the request is refused. [*See C&R No 35 of the 2014 SC*] |

### 13. Alternative channels of transmission

| | |
|---|---|
| 102 | The SC stressed that Article 8 of the Convention provides for the direct service of documents by consuls and diplomatic officials, while Article 9(1) provides for the transmission of documents from one Contracting Party to the authorities of another Contracting Party designated by the latter for this purpose. |
| 103 | The SC reinforced that Article 9(2) only applies in exceptional circumstances. |
| 104 | The SC reaffirmed its clear understanding that the term "send" in Article 10(a) is to be understood as meaning "service" through postal channels. [*See C&R No 55 of the 2003 SC*] |
| 105 | The SC noted that Article 10(a) includes transmission and service by e-mail, insofar as such method is provided by the law of the State of origin and permitted under the law of the State of destination. The SC reiterated that service by e-mail under Article 10(a) must meet the requirements established under Article 1 of the Convention, in particular that the addressee's physical address in the State of destination is known. The SC noted that e-mail domains are not sufficient for locating the person to be served under Article 10(a). |
| 106 | The SC reiterated that Contracting Parties may impose other requirements and safeguards regarding the use of e-mail under Article 10(a) and encouraged Contracting Parties to indicate any such requirements in their Country Profiles. |
| 107 | The SC noted that a Contracting Party, rather than filing a blanket opposition to the use of postal channels under Article 10(a), is allowed to make a qualified declaration stating the conditions in which that Contracting Party accepts incoming transmissions, such as requiring registered mail with acknowledgment of receipt. The SC noted that several qualified declarations, with different conditions, have been made or revised in the past 10 years. [*See C&R No 28 of the 2009 SC*] |

108      The SC noted the practical importance of the methods of service provided by the Convention under Article 10(b) and 10(c), in particular in relation to the prompt and effective execution of requests. The SC encouraged Contracting Parties to review and revisit their oppositions to the use of these methods.

109      The SC recommended that persons forwarding requests for service under Article 10(b) or 10(c) enquire with authorities in the State of destination, before sending a request for service in order to properly identify to whom the request should be sent. [See *C&R No 33 of the 2014 SC*]

### 14. Relationship of the Convention with other instruments

110      Recalling the relationship of the Convention with other instruments, the SC recommended greater elaboration in the Service Handbook on such relationship, including with regional and bilateral instruments. The SC encouraged Contracting Parties to provide information about all other instruments that would apply in parallel with the Service Convention in their Country Profiles.

### 15. Contractual waivers and the Convention

111      The SC took note of a case reported by one Contracting Party in which the court found that the parties' agreement to use alternative means of notification constituted a waiver of formal service of process under the applicable law. The SC recalled the Convention's non-mandatory, but exclusive, character, according to which the Convention will only apply if the domestic law of the forum determines that there is occasion to transmit a document for service abroad; if so, one of the available channels under the Convention must be used. The SC also stressed the potentially negative impact of such contractual agreements, namely, in relation to the protection of defendants under Articles 15 and 16 of the Convention, and the recognition and enforcement of judgments in the Contracting Party. The SC further questioned the effect of privately negotiated agreements in light of Contracting Parties' declarations and reservations.

### 16. Service on foreign States and State officials

112      The SC noted the different practices in serving foreign States, State officials and State-owned companies. The SC encouraged further discussions at the Working Group on the Service Convention and recommended to reflect such discussions in the Service Handbook. The SC also recommended that Contracting Parties provide information on the service on foreign States and State officials in their Country Profiles.

113      While the absence of a specific rule on the date of service has not been noted to cause major problems in practice with respect to litigation between private parties, the SC recognised the importance of complying with any applicable customary international law requirements when serving sovereign parties under the Convention.

114      The SC also confirmed that receipt by the Central Authority of a Contracting Party does not constitute effective service on that State or its officials. The SC noted that service on diplomatic missions is not permitted.

### 17. Relationship between the Service and Evidence Conventions

115      The SC noted that cases have arisen concerning the relationship between the Service and Evidence Conventions. [See *C&R No 40 of the 2009 SC*]

116      The SC recommended that the Service Handbook elaborate on the relationship between the two Conventions, by incorporating the relevant text contained in the Evidence Handbook and reflecting the discussions on particular matters such as subpoenas at the subsequent meeting of the Working Group on the Service Handbook. The SC recommended that the requesting authority choose carefully which Convention to make the request under to avoid rejection of the request.

### 18. Articles 15 and 16

117      The SC recalled the purpose and fundamental importance of Articles 15 and 16, which are designed to balance the interest of all parties. The SC reaffirmed the need for the Convention to operate so as to sustain the procedural rights of the parties, and encouraged Contracting Parties

|  |  |
|---|---|
|  | to consider making declarations to Articles 15(2) and 16(3) with a view to achieving the full operation of the Convention. [*See C&R No 74 of the 2003 SC*] |
| 118 | The SC recalled the principle that the defendant should be given actual notice in sufficient time to allow them to prepare a defence. This was significant notably where in the State addressed consideration was given to the validity of service. [*See C&R No 78 of the 2003 SC*] |
| 119 | The SC noted, with reference to Article 15(2)(c), that the receipt of a Certificate that no service could be effected is not an obstacle to the giving of a judgment in accordance with the domestic law of the requesting State when such State has made the relevant declaration. [*See C&R No 35 of the 2009 SC*] |
| 120 | The SC recognised that the types of relief against a default judgment contemplated in Article 16 (including appeal and other forms of redress) are a matter for domestic law. [*See C&R No 34 of the 2014 SC*] |
| 121 | The SC recalled that the Convention does not address the issue of recognition and enforcement of judgments. [*See C&R No 78 of the 2003 SC*] |

## V. "Civil or commercial matters" under the Service and Evidence Conventions

| | |
|---|---|
| 122 | The SC recalled its former C&R on the term "civil or commercial matters" and recommended that this term be interpreted in a broad, liberal and autonomous manner, without reference exclusively to either the law of the requesting State (or State of origin), or to the law of the requested State (or State of execution), or to both laws cumulatively. The term should be interpreted consistently across both the Service and Evidence Conventions. [*See C&R No 26 of the 1989 SC, C&R No 69 of the 2003 SC, C&R No 13 of the 2009 SC, C&R No 40 of the 2014 SC*] |
| 123 | The SC also recalled that when interpreting the phrase "civil or commercial matters", one should focus on the nature of the cause of action and keep in mind that the Conventions do not expressly exclude any particular subject matter from the scope of "civil or commercial matters". The SC invited Contracting Parties to encourage their Central Authority to communicate, by using IT, with the forwarding authority when problems of interpretation arise. It recommended that Contracting Parties encourage forwarding authorities to include in their requests some information about the nature of the cause of action, in particular where a request may give rise to doubts as to whether it falls within the scope of the Conventions. [*See C&R No 14 of the 2009 SC*] |
| 124 | The SC cautioned that the meaning of "civil and commercial" appearing in other instruments should not be relied on for interpretation without considering the object and purpose of such other instruments. [*See C&R No 72 of the 2003 SC*] |
| 125 | The SC noted that some Contracting Parties do not regard as "civil or commercial matters" claims in relation to acts of States in the exercise of State authority. |
| 126 | The SC recommended that rather than Contracting Parties developing a list-based approach to identify the scope of "civil or commercial matters", Contracting Parties consider requests on a case-by-case basis, with the aim of providing the broadest possible cross-border judicial cooperation. |

## VI. Good practices

| | |
|---|---|
| 127 | The SC noted the value and usefulness of a document outlining good practices for the operation of the Conventions (Good Practices document). The SC noted the importance of ensuring the consistency of this document with the Handbooks and the 2024 SC C&R. In this connection, the SC recommended the Working Groups on the Handbooks to continue the work carried out on the Good Practices document, with a view to submitting it to CGAP for approval. |

## VII. Standardisation of data and statistics

| | |
|---|---|
| 128 | Taking into account Conclusion & Decision No 59 of CGAP 2024, the SC noted the usefulness of standardising the collection of data and statistics in assessing the effective operation of the Conventions. The SC also recommended that the PB develop questions to be retained as standard inclusions across future questionnaires with a view to facilitating discussions at future SC meetings and to assist authorities in planning to report statistical data. |

129      Recognising the different legal and technical frameworks among Contracting Parties and the resourcing for Central Authorities and other authorities under the Conventions, the questions should relate to data that is easily identifiable and readily available to the Central Authorities.

## VIII. Handbooks

130      The SC welcomed the updated Service and Evidence Handbooks, prepared by the PB and considered by the Working Groups. The SC acknowledged the importance and usefulness of these Handbooks. [S*ee C&R No 5 of the 2014 SC*]

131      The SC approved, in-principle, the fifth edition of the Handbooks, while noting that further amendments will be made, including incorporating the discussions at the SC meeting and relevant C&R, in cooperation with the Working Groups. The SC recommended to CGAP to approve the Handbooks.

132      Taking into account the available resources and with a view to publishing the Handbooks efficiently, the SC recommended to proceed with the finalisation of the Service Handbook first and to have it approved by the Members through a written procedure ahead of the 2025 CGAP meeting. The Evidence Handbook will be submitted to CGAP for approval at its 2025 meeting.

133      Once published, the SC encouraged Contracting Parties to promote the use of the Handbooks. Contracting Parties are also encouraged to arrange for the translations of the Handbooks into their languages. [S*ee C&R No 9 of the 2009 SC, C&R No 7 of the 2014 SC*]

## IX. Country Profiles

134      The SC welcomed the draft Country Profiles for the Service and Evidence Conventions prepared by the PB and considered by the Working Groups, and agreed that the Country Profiles will provide a useful source of information for any parties or officials seeking to make a request to another Contracting Party for the service of documents or the taking of evidence abroad, and that Contracting Parties should undertake efforts to promote the existence of these Country Profiles domestically and recommended that they be consulted prior to the making of a request.

135      The SC noted that further amendments would be made to the questions in the draft Country Profiles, including incorporating the discussions at the SC meeting and relevant C&R, in co-operation with the Working Groups. The SC recommended that once the Country Profiles are finalised, they be submitted to CGAP for approval.

## X. Future work

### 1. Meetings

136      The SC recommended informal online meetings for Central Authorities to exchange experiences. The first meeting would be organised by the PB, subject to available resources, following the publication of the Handbooks and the release of the Country Profiles for the Service and Evidence Conventions.

137      The SC encouraged Contracting Parties to meet online to further discuss and exchange experiences to develop a deeper understanding of the use of IT and to develop further guidance for e-transmission and associated matters. These discussions will be supported by, or conducted under the auspices of, the PB. Such meetings will be held by way of online workshops for Central Authorities and other users of the Service and Evidence Conventions.

### 2. Model Forms under Chapter II of the Evidence Convention

138      The SC welcomed the development of Model Forms for the taking of evidence under Chapter II and invited the Working Group on the Evidence Handbook to continue the development of the Model Forms. The final versions of the Model Forms for Chapter II will be submitted to CGAP for approval.